# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                       )
    Plaintiff,                )
                                       )
    v.                       )
                                     )
                                   )No. 4:21-CR-00038 AGF/NAB
                                     )
ROBERT ISTILL MCNAIR,        )
                                     )
    Defendant.              )

## EVIDENTIARY HEARING

### BEFORE THE HONORABLE NANNETTE A. BAKER
### UNITED STATES MAGISTRATE JUDGE

### JULY 23, 2021

APPEARANCES:

For Plaintiff:      William Scharf, Esq.
                      OFFICE OF THE U.S. ATTORNEY
                      111 South 10th Street, 20th Floor
                      St. Louis, MO  63102

For Defendant:      Ryan Martin, Esq.
                      TAAFFE AND ASSOCIATES
                      1015 Locust, Suite 1032
                      St. Louis, MO  63101

Reported By:        SHANNON L. WHITE, RMR, CRR, CSR, CCR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

# INDEX OF WITNESSES


## PLAINTIFF'S WITNESSES

**REBECCA CORY**                                    **PAGE**

Direct Examination by Mr. Scharf ................   4
Cross-Examination by Mr. Martin .................   14
Redirect Examination by Mr. Scharf ..............   21

1    **(PROCEEDINGS STARTED AT 10:01 AM.)**

2    **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3    **THE DEFENDANT PRESENT:)**

4    THE COURT:  Good morning.  We are on the record now

5    in the matter of United States of America v. Robert McNair,

6    Cause No. 4:21-CR-038, and we are set today for an evidentiary

7    hearing in this case.

8    At this time, I'm going to ask counsel for the

9    Government to announce your presence for the record.

10   MR. SCHARF:  William Scharf for the United States,

11   Your Honor.

12   THE COURT:  And counsel for the defendant.

13   MR. MARTIN:  Ryan Martin on behalf of the defendant,

14   Your Honor.

15   THE COURT:  All right.  And as I stated, we are here

16   for an evidentiary hearing.  The defendant has filed a motion

17   to suppress evidence; correct?

18   MR. MARTIN:  Yes, Your Honor.

19   THE COURT:  And at this time, does the Government

20   have -- how many witnesses do you anticipate having?

21   MR. SCHARF:  Just one, Your Honor.

22   THE COURT:  Okay.  And does the defendant anticipate

23   having witnesses?

24   MR. MARTIN:  No, Your Honor.

25   THE COURT:  All right.  You may proceed.

1      MR. SCHARF:  Thank you, Your Honor.  Where would

2  you -- I know with COVID and everything, where would you like

3  me?  At the podium?

4      THE COURT:  You can be at the podium, yes.

5      MR. SCHARF:  Thank you, ma'am.

6      The United States would call U.S. Probation Officer

7  Rebecca Cory, Your Honor.

8                    **(WITNESS SWORN BY THE CLERK.)**

9      THE COURT:  You may proceed.

10     MR. SCHARF:  Thank you, Your Honor.

11                         **REBECCA CORY,**

12 **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

13 **FOLLOWS:**

14                      **DIRECT EXAMINATION**

15 **BY MR. SCHARF:**

16 Q    Could you please state your name for the record.

17 A    Rebecca Cory.

18 Q    And what's your occupation, Ms. Cory?

19 A    U.S. probation officer.

20 Q    And in your capacity as a U.S. probation officer, what

21 are your -- what are your duties?

22 A    Our duties are to monitor the person on supervision and

23 their activities as well as make sure that they are completing

24 the conditions that the judge has ordered.

25 Q    And this is people who are on federal supervised release;

1  is that correct?

2  A   Correct.

3  Q   And how long have you been in this position for?

4  A   Four years.

5  Q   And in that time, very roughly, how many people on

6  supervised release would you estimate you've supervised?

7  A   Five hundred.

8  Q   Five hundred in four years?

9  A   Uh-huh.

10 Q   And were you assigned to supervise Robert Istill McNair?

11 A   Yes.

12 Q   And do you see him in the courtroom today?

13 A   Yes.

14 Q   Could you identify him by a piece of clothing he's

15 wearing.

16 A   The yellow shirt.

17       MR. SCHARF:  Can the record reflect the

18 identification, Your Honor?

19       THE COURT:  The record will reflect that the

20 defendant has been identified by the witness.

21 Q   (BY MR. SCHARF) So after you were assigned to supervise

22 Mr. McNair, did you go through with him the conditions of his

23 supervision?

24 A   Yes.

25 Q   And did one of those conditions relate to where he was

1  and wasn't allowed to go?

2  A     Yes.

3  Q     What was that condition?

4  A     It's a standard condition that they cannot leave the

5  district in which they are authorized to reside without prior

6  permission from the probation office or court.

7  Q     And his district was the Eastern District of Missouri; is

8  that right?

9  A     Correct.

10  Q     And did you also discuss with him the need that he be

11  truthful with you?

12  A     Correct.

13  Q     And is that also a standard condition of supervision?

14  A     Correct.

15  Q     And was there a condition that related to contact with

16  law enforcement?

17  A     Yes.  That's also a standard condition.

18  Q     And what is that condition?

19  A     He must report any contact with law enforcement within 72

20  hours.

21  Q     And was there also a condition that related to firearms

22  or ammunition?

23  A     Yes.  That's a mandatory condition.  You are not supposed

24  to use, possess, or have access to any firearm or dangerous

25  weapon.

1  Q    And there was also a special condition imposed on

2  Mr. McNair related to searches; is that right?

3  A    Correct.

4  Q    And what was that condition?

5  A    The search condition states that, if there is reasonable

6  suspicion, that the probation office can come into the

7  residence or search his person, office, vehicle, et cetera,

8  for evidence of violation of that condition.

9  Q    And you went through all of these conditions with

10  Mr. McNair when he began to be under your supervision; is that

11  correct?

12  A    Correct.

13  Q    Do you recall an incident involving Mr. McNair that you

14  were informed of on August 19, 2020?

15  A    Yes.

16  Q    What happened on that date?

17  A    Mr. --

18        MR. MARTIN:  I'm going to object.  This is -- I think

19  this is hearsay.

20        THE COURT:  Go ahead.

21        MR. SCHARF:  Your Honor, I'm asking the witness to

22  relate what she was told.  I'm not offering it for the proof

23  of what she was told, but it speaks to her state of mind and

24  her understanding of just what she was being told.

25        THE COURT:  Overruled.

1  A    I received a call from the defendant reporting that he

2  had had contact with law enforcement and that he was a witness

3  to a -- an -- sorry -- motor vehicle accident.

4        And then shortly after on the same date, I received a

5  call from an Illinois State Trooper reporting that there was

6  indeed a motor vehicle accident in which Mr. McNair was

7  involved as the sole driver of the motorcycle.  And during

8  that traffic stop, or the reporting of the accident, a firearm

9  was located in or around the path of travel that the

10 motorcycle took along with where -- the general vicinity where

11 his other articles were located.

12 Q    Let me back you up just a minute.  So on August 19, 2020,

13 you received a call from the defendant; is that right?

14 A    Correct.

15 Q    And what did he tell you specifically?

16 A    That he was a witness in an accident and so he had

17 contact with law enforcement.

18 Q    Did he tell you where that accident was?

19 A    It was -- I believe he said the city, but it was breaking

20 up, and so I did not -- I'm not sure exactly where.

21 Q    Understood.  And then you received a call from an

22 Illinois State Trooper; is that right?

23 A    Correct.

24 Q    And do you want to run through exactly what he told you?

25 A    Yes.  He said that there --

1   MR. MARTIN:  Judge, just for the record, can you note

2   my continuing objection?

3   THE COURT:  Yes.  The Court will note the defendant's

4   continuing objection to this line of testimony.

5   MR. SCHARF:  Understood, Your Honor.

6   MR. MARTIN:  Thank you.

7   A   So the Illinois State Trooper called and reported that he

8   had had contact with Mr. McNair in Washington Park, Illinois,

9   which is outside of the district of the Eastern District of

10  Missouri.

11  Q   And being outside of the Eastern District of Missouri was

12  itself a violation of the conditions of supervised release

13  that Mr. McNair was under; is that right?

14  A   Correct.

15  Q   Please continue.

16  A   Okay.  Then he reported that there was a single

17  motorcycle accident with very minimal damage and the defendant

18  identified himself as the driver of the vehicle.  The state

19  trooper asked for his license and registration.  Mr. McNair

20  provided his license to the trooper and then asked to be able

21  to search the ditch for his registration and insurance card.

22  And when he was allowed to do that, what ended up is

23  that Mr. McNair left the scene.  So the state trooper then

24  searched the ditch where all the property was scattered and

25  during that search located a firearm.

1    Q    And that firearm was later identified as a Taurus 9 mm

2    semi-automatic handgun; is that right?

3    A    Correct.

4    Q    After you spoke with the Illinois State Trooper, did you

5    speak to Mr. McNair again?

6    A    Yes.

7    Q    And what did you ask him, and what did he tell you?

8    A    Honestly, I cannot remember.

9    Q    After learning about this incident, what further action

10   did you take?

11   A    I talked to my supervisor, and at that time, we decided

12   that it would be best to request a search of his residence be

13   conducted.

14   Q    And why was that?

15   A    Because of the report of him possibly being in possession

16   of the firearm and the state trooper's suspicion that he was

17   in possession of it as well as his other violations pertaining

18   to that event.

19   Q    So based on your training and experience, why was the

20   firearm recovered at the scene concerning to you?

21   A    It's a violation of his conditions of supervision -- not

22   to possess a firearm or ammunition.  And based on my training

23   and experience, if they've had a firearm, they are likely

24   going to be committing other crimes or involved in other

25   criminal activities.

1    Q    So there was, in fact, a search authorized by the court

2    in this case; is that right?

3    A    Correct.

4    Q    And that search was authorized on August 26, 2020; is

5    that right?

6    A    Correct.

7    Q    But that search wasn't immediately conducted; right?

8    A    Correct.

9    Q    Why is that?

10   A    Because of the coronavirus, things started getting shut

11   down, and so our procedures kind of went on a stall to

12   determine whether -- you know, the safety of working in

13   different environments.  And so it was postponed numerous

14   times.

15   Q    And did you take any action during those postponements?

16   A    Yeah.  Mr. McNair was placed on location monitoring so

17   that we could monitor his whereabouts.

18   Q    And why was that?

19   A    Because he had left the district and because of the

20   suspicion that he was involved in criminal activity still.

21   Q    There eventually was a search conducted in this case; is

22   that right?

23   A    Correct.

24   Q    When was that?

25   A    November.

1  Q    And at the time the search was conducted, your principal

2  concerns were still related to this accident in Illinois?

3  A    The concern was that he could be in possession of a

4  firearm or be engaged in other criminal activity based on the

5  suspicion with his violation of conditions pertaining to the

6  Illinois event.

7  Q    So in November what happened exactly?

8  A    So the defendant reported to the probation office.  He

9  was then placed in custody at that time by our search team.

10  He was transported with the search team and myself to his

11  residence in which, then, the search was conducted.

12  Q    And did he say anything to you during that

13  transportation?

14  A    On the way from the courthouse to his residence, he

15  indicated that there was a firearm in the residence, and he

16  stated that it was his roommate's.

17  Q    Mr. McNair had recently moved residences; is that right?

18  A    Correct.

19  Q    And so what was his living situation at the time of the

20  search?

21  A    He had one roommate, and she had minor children living at

22  the residence as well.

23  Q    And was -- had she -- had Mr. McNair indicated that she

24  was a romantic partner?

25  A    No.  He said that they were co-workers.

1   Q    Did he have his own bedroom in the residence where he was

2 living?

3   A    Yes.

4   Q    And you did not believe that they cohabited?

5   A    Not to my knowledge.

6   Q    So while he was being transported to his house for the

7 search, Mr. McNair said that his roommate might have a gun; is

8 that right?

9   A    Yes.

10   Q    And then the search was conducted; is that right?

11   A    Correct.

12   Q    And what happened then?

13   A    During the search, they located a firearm and a magazine

14 in the nightstand next to Mr. McNair's bed.  In the nightstand

15 also was Mr. McNair's ID card.

16   Q    And that gun was a Sig Sauer .357 caliber, semi-automatic

17 handgun; is that right?

18   A    Yes.

19   Q    There were also two handgun magazines found during the

20 search; is that right?

21   A    Yes.

22   Q    And those were both 9 mm caliber magazines; is that

23 right?

24   A    I believe so.

25   Q    And that's the same caliber as the gun that was recovered

1 from the scene in Illinois; is that right?

2 A    Correct.

3 Q    What happened then?

4 A    He was placed into custody and taken to the Jennings jail

5 after a warrant was issued for his arrest.

6         MR. SCHARF:  Nothing further, Your Honor.

7         THE COURT:  You may cross-examine.

8                      **CROSS-EXAMINATION**

9 **BY MR. MARTIN:**

10 Q    So this Illinois incident -- you weren't personally

11 involved in that; right?

12 A    No.

13 Q    And you didn't witness anything in that incident

14 personally?

15 A    No.

16 Q    So the information that you're getting is coming from

17 another individual; right?

18 A    Yes.

19 Q    Okay.  So you said that Mr. -- you said that Mr. McNair

20 was placed on location monitoring after this Illinois

21 incident.  What did that involve?

22 A    Location monitoring involves having a bracelet that

23 monitors his whereabouts.  And the defendant is required to

24 submit a schedule every month so that we know where he is

25 supposed to be and we can allow him to be out of the residence

1  for work purposes.

2  Q    Okay.  And did he comply with that?

3  A    Yes.

4  Q    And were there any violations that you noticed from that

5  monitoring?

6  A    Minor violations such as being at a location that we

7  didn't know.  He was allowed to be out at that time but not at

8  that specific location.

9  Q    Okay.  So you were there for the actual search of his

10 residence; right?

11 A    I was in the car with Mr. McNair.

12 Q    Okay.  Did you participate in the search at all?

13 A    No.

14 Q    So you don't know how the search was conducted at all?

15 A    No.

16 Q    Okay.  So the information that you're receiving is coming

17 from other people who actually conducted the search?

18 A    Correct.

19 Q    So you couldn't tell us where these items were found in

20 the residence?

21 A    Correct.

22 Q    Just through other people; right?

23 A    Right.  I did go into the house once they did locate

24 those items, and I did personally witness them being in the

25 residence.

1  Q   Okay.  But you don't know if they were in plain view, you

2  know, personally, or anything like that; right?

3  A   Correct.

4  Q   Just what you know from other people.  All right.

5       And his bedroom -- can you explain how his bedroom

6  was in the residence?

7  A   It was in a hallway to the left.  Had a bed, a

8  nightstand, a dresser.

9  Q   Okay.  When you say "hallway," what do you mean exactly?

10  Was it like -- was it a traditional bedroom-style bedroom, or

11  was it like in the open somewhere?

12  A   No.  It was a bedroom.

13  Q   But you said it was in the hallway?

14  A   It was off of the hallway.  There was a hallway from the

15  living room, and then to the left was -- or I'm sorry.  The

16  living room was the front room.  To the left, then, was a

17  hallway, and his bedroom was off of the hallway.

18  Q   Okay.  Do you know how many beds were in that room?

19  A   One.

20  Q   And then could you describe the room for us.

21  A   It was one bed, one nightstand, and there was a dresser.

22  Q   Okay.  Do you know how long he had been living at that

23  place at the time of the search?

24  A   He had reported that he moved approximately a month

25  before the search was conducted.

1  Q    Okay.  And the search was conducted on November 12, 2020?

2  A    Correct.

3  Q    All right.  So this Illinois incident occurred in August

4  of 2020; is that right?

5  A    Correct.

6  Q    And at that time, a search was authorized by the court?

7  A    Correct.

8  Q    But because of COVID, you guys didn't search?

9  A    Not at that time.

10 Q    Okay.  And then you didn't search that entire month of

11 August; right?

12 A    Correct.

13 Q    Or the entire month of September?

14 A    Correct.

15 Q    Then in October his conditions of MSR are modified to

16 include the 90-day location?

17 A    Correct.

18 Q    And sometime in October, too, Mr. McNair moved into a new

19 residence; right?

20 A    Correct.

21 Q    And whenever he was in the new residence, a virtual

22 walk-through was conducted; right?

23 A    Correct.

24 Q    Can you explain exactly what that means?

25 A    So basically it's a Facetime or a virtual meeting, and

1  he -- I have them flip the camera and walk through the

2  residence and show me where all the rooms are, what the rooms

3  look like, and what's in the rooms.

4  Q    Okay.  And at that time, did you see any evidence of any

5  criminal activity or anything like that?

6  A    No contraband was observed in plain view.

7  Q    Okay.  And that was in October of 2020.  The search was

8  conducted November 12, 2020; right?

9  A    Correct.

10  Q    And so why was it -- why on November 12, 2020?

11  A    That's when the search team was available and the office

12  determined that it was safe procedurally to conduct the search

13  based on COVID.

14  Q    Okay.  And at that time, to your knowledge, were any

15  vaccines available or anything like that?

16  A    I'm not sure, to be honest.

17  Q    Okay.  So the search team -- what search team are you

18  referring to?

19  A    The probation search team.

20  Q    And so the search team, the probation search team -- they

21  thought in August that you guys had protocols, were not

22  searching any residence, or are you picking and choosing which

23  are priority cases?

24  A    I'm not sure.  I know that that did not come from the

25  search team itself but by our managerial.

1    Q    Okay.  So you don't know if you guys conducted any

2    searches from August 2020 through October 2020?

3    A    I'm not sure.

4    Q    Okay.  So other than your protocol at your -- from your

5    superiors, you don't know why the search was delayed from

6    August to November other than the COVID protocols; right?

7    A    Correct.

8    Q    Did you find any other -- were there any other

9    allegations, to your knowledge, that Mr. McNair was in

10   possession of any firearms?

11   A    No.

12   Q    Were there any allegations that he possessed any drugs or

13   firearms or any type of criminal activity going on in his

14   residence?

15   A    No.

16   Q    And this was at either residence; right?  Because he

17   moved.

18   A    Correct.

19   Q    So your search, even though you didn't participate in it

20   personally, was conducted solely because --

21        MR. SCHARF:  Objection, Your Honor.  I think that the

22   record the witness has made indicates that she was personally

23   involved to an extent in the search.

24        THE COURT:  Her testimony -- I recall her testimony

25   being that she did not conduct the search.  She did go in

1   after the items were found, if I am -- if that's my

2   recollection.

3           THE WITNESS:  Yes, Your Honor.

4           THE COURT:  Is that correct?

5           All right.  So I understand that.  And I will allow

6   his question based on my understanding of what happened.

7           MR. MARTIN:  Thank you, Your Honor.

8   Q   (BY MR. MARTIN) So the sole reason for your search on

9   November 12, 2020, was because of what you learned through

10  another individual about a firearm in October -- or I'm

11  sorry -- in August of 2020.  Is that fair to say?

12  A   It was not just based on the firearm.  If we have

13  reasonable suspicion that any condition of his supervision has

14  been violated, then we are authorized to search the residence

15  for evidence of the violations.

16  Q   Okay.  So you -- so say that one more time.  I'm sorry.

17  A   So the search condition states that we are able to come

18  in and search the residence more thoroughly than a plain-view

19  search if we have reasonable suspicion that the defendant has

20  violated any conditions of their supervision.

21  Q   And your reasonable suspicion was based on the firearm;

22  right?

23  A   The reasonable suspicion was also he was in located in

24  Illinois, which is a violation of his condition as well.

25  Q   Okay.  And that was all based on information that you got

1  from a third party?

2  A    Correct.

3        MR. MARTIN:  I don't have any other questions.  Thank

4  you.

5        THE COURT:  Yes.  You may proceed.

6        MR. SCHARF:  Thank you, Your Honor.

7                    **REDIRECT EXAMINATION**

8  **BY MR. SCHARF:**

9  Q    The defendant did himself confirm that he had been at the

10 scene of this motorcycle accident; is that right?

11 A    Yes.

12 Q    And did he admit to you that it occurred in Southern

13 Illinois?

14 A    I do not remember.

15 Q    But he reported to you that he had had interaction with

16 law enforcement; is that right?

17 A    Yes.  We did discuss, actually, that he -- his conditions

18 being able to go over to another district.  So I can't say

19 definitively whether he admitted to being in Illinois, but I

20 do recall us talking specifically about that condition and

21 that he was -- and reminding him about that condition since it

22 was a violation.

23 Q    And at the time the search was conducted, you were still

24 suspicious that he was violating terms of his supervision; is

25 that right?

1  A    Yes.

2  Q    And that was based on the incident in Illinois; is that

3  right?

4  A    Yes.

5  Q    Was that also based on other issues that he had had with

6  location monitoring?

7  A    Yes, going to locations that he was not authorized to be

8  at.

9  Q    When people violate terms of their supervision, do they

10 tend to, I guess, reoffend?

11       Let me rephrase.  I apologize, Your Honor.

12       When you become aware that people under supervision

13 have violated the terms of their supervision, do those

14 violations often form a pattern?

15 A    Yes.

16 Q    So a violation of one term of supervision could easily

17 indicate that a defendant is violating other terms of

18 supervision as well; is that right?

19 A    Yes.

20 Q    Now, the defense counsel made the point that you were not

21 personally involved in the incident in Illinois; right?

22 A    Correct.

23 Q    Did the information you were told by both the defendant

24 and this police officer in Illinois inform your views of the

25 defendant's supervision?

1  A    Yes.

2            MR. SCHARF:  I have nothing further, Your Honor.

3            THE COURT:  Do you have more?

4            MR. MARTIN:  No, Your Honor.

5            THE COURT:  Okay.  I actually do have a question.

6        You testified that there was a judicial or court

7   authorization for the search back in August.  So was there a

8   search warrant, or what was the authorization?

9            THE WITNESS:  No.  The judge, Judge Clark, authorizes

10  when a search is completed, and I don't know the procedures

11  besides the assistant deputy.

12           THE COURT:  So the district judge authorized a search

13  based on the issues that occurred in Illinois.

14           THE WITNESS:  Correct, Your Honor.

15           THE COURT:  So the search that eventually took place

16  in November -- was that done pursuant to that judicial

17  authorization?

18           THE WITNESS:  Yes, Your Honor.

19           THE COURT:  Okay.  Does anyone have any additional

20  questions?

21           MR. SCHARF:  Not us, Your Honor.

22           THE COURT:  Okay.  And nothing on behalf of the

23  defendant now that I asked that question?

24           MR. MARTIN:  No.  No, Judge.

25           THE COURT:  All right.

1          You may step down.  You're excused.

2          Is there any additional testimony or evidence on

3    behalf of the Government?

4          MR. SCHARF:  We have no further witnesses at this

5    time, Your Honor.

6          THE COURT:  All right.  Anything on behalf of the

7    defendant at this time?

8          MR. MARTIN:  No, Your Honor.

9          THE COURT:  And so I have the briefs that were filed

10   in this case.  And I just want to make sure.  So you filed a

11   motion, but I do not see a memorandum in support.  Or did I --

12   maybe I'm not looking in the right place.

13         Did you file a memorandum in support?

14         MR. MARTIN:  I did not, Judge.

15         THE COURT:  What I'm going to allow you to do, then,

16   is to file a post-hearing memorandum.  And if you wish to

17   order a transcript, I will allow you to, once you receive the

18   transcript, to have a period of time.  How much time -- would

19   you be ordering a transcript?

20         MR. MARTIN:  I don't think so.

21         THE COURT:  Okay.  You won't be ordering a

22   transcript.

23         Does the Government wish to order a transcript?

24         MR. SCHARF:  We won't if they don't, Your Honor.

25         THE COURT:  All right.  So how much time do you need,

1   then, to file post-hearing briefing?

2           MR. MARTIN:  I'm going on vacation next week.  So

3   could I have 30 days?

4           THE COURT:  Thirty days to file -- yes.

5           MR. MARTIN:  Thank you.

6           THE COURT:  And then how much time would you need for

7   response?

8           MR. SCHARF:  Just a week, Your Honor.

9           THE COURT:  Okay.  So the defendant will have 30 days

10  from today to file a post-hearing brief, and that should take

11  us to -- we are at the 23rd.  So I will give you until August

12  23.  And then the Government will have until August 30 to file

13  a response.

14          MR. MARTIN:  Thank you, Judge.

15          THE COURT:  And I will rule after I receive briefing

16  in this case.  Thank you.

17          MR. SCHARF:  Thank you, Your Honor.

18          THE COURT:  That concludes this proceeding.

19              **(PROCEEDINGS CONCLUDED AT 10:29 AM.)**

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

I further certify that this transcript contains
pages 1 through 26 inclusive and that this reporter takes no
responsibility for missing or damaged pages of this transcript
when same transcript is copied by any party other than this
reporter.

Dated at St. Louis, Missouri, this 8th day of September,
2021.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter